UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STORY OF STUFF PROJECT**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES FOREST SERVICE** *et al.*, <br><br> Defendants. | Case No. 1:18-cv-00170 (TNM) |

## MEMORANDUM OPINION

The Story of Stuff Project filed this Freedom of Information Act ("FOIA") case seeking government records related to Nestlé Waters North America, Inc.'s ("Nestlé") operations in the San Bernardino National Forest. In response, the United States Forest Service and the Department of Agriculture (collectively, the "Government") produced hundreds of emails and photographs, several videos, and thousands of pages of responsive records. Relying on FOIA Exemptions 4, 5, 6, and 9, the Government withheld some records and produced others with significant redactions. The Project challenges these withholdings as unjustified.

Both parties have moved for summary judgment. The Court finds that the Government properly withheld information under Exemptions 4, 5, and 9. But the Court also finds that the Government inappropriately invoked Exemption 6. Thus, both the Government's Motion and the Project's Cross-Motion will be granted in part and denied in part.

## I.

Nestlé sells bottled drinking water, among other things. To collect the water it needs, the company owns and operates tunnels, wells, transmission pipelines, and associated structures in

the Strawberry Creek Watershed in the San Bernardino National Forest. Pl.'s Cross-Mot. for Summ. J., ECF No. 22 ("Pl.'s Cross-Mot."), Ex. 1-A, ECF No. 22-2 at 1. Because Strawberry Creek is on National Forest System lands, Nestlé's operation requires a license from the federal government. *Id*. This authorization, known as the "Arrowhead Springs Permit," was last issued by the Forest Service in 1978. *Id*. In 2015, the Service announced that it would consider renewing the permit, and it issued Nestlé a new permit in June 2018. *Id*. at 3.

The Story of Stuff Project is a nonprofit "actively involved in environmental sustainability and resource conservation efforts." Compl. 2, ECF No. 1. Beginning in 2015, it sought to "prepare its public comments" to "meaningfully participate in the public process surrounding [the Service's] review of [Nestlé's] permit." Pl.'s Reply in Supp. 1, ECF No. 29 ("Pl.'s Reply"). To that end, it submitted several FOIA requests to the Government. It requested:

> Copies of any and all records pertaining in any way to: The water diversion and transmission facilities constructed and operated on U.S. Forest Service land in and near the West Fork of Strawberry Creek in the San Bernardino National Forest; and The Nestle Waters North America Inc. Special Use Permit [Categorial Exclusion] listed on the Current Schedule of Proposed Actions (SOPA) . . . .

*See* Defs.' Mot. for Summ. J., ECF No. 19 ("Defs.' Mot."), Attach. 4, ECF No. 19-4 at 2.

After receiving nothing in response, the Project filed this suit. Eventually, the Government produced roughly 3,000 pages of responsive documents. But some of these pages were partially or fully redacted. Pl.'s Cross-Mot. at 9.

This is not the first time that the Project has challenged the Forest Service's withholding of information related to the Arrowhead Springs Permit. For reasons known only to the Project, it brought another case based on virtually identical FOIA requests in this district last year. *See Story of Stuff Project v. U.S. Forest Service*, -- F. Supp. 3d --, 2018 WL 4637357 (D.D.C. Sept.

2

27, 2018). The parties' arguments, declarations in support, and evidentiary materials here largely mirror those considered in Judge Mehta's thoughtful 2018 opinion.

Here, as in the that case, the Government has invoked several exemptions in support of its redactions, including:

- Exemption 4 (protecting trade secrets and confidential commercial information),
- Exemption 5 (protecting documents covered by the attorney-client and deliberative process privileges),
- Exemption 6 (protecting against undue invasions of personal privacy), and
- Exemption 9 (protecting geological and geophysical information about wells).

*See* Defs.' Mot. at 7-15; *Story of Stuff Project*, 2018 WL 4637357 at \*2. The Project believes that the Government has misapplied these Exemptions, and it thus seeks production of unredacted versions of several documents.

## II.

The "vast majority" of FOIA cases are resolved on summary judgment motions. *Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011). To prevail on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute is material if it could alter the outcome of the suit under the substantive governing law. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In the FOIA context, the Government is entitled to summary judgment if it establishes "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents," *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (cleaned up), and that each relevant record has been produced or is exempt from disclosure. *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001). FOIA permits agencies to withhold information that falls under "one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) (citations omitted).

The Government "bears the burden of establishing that a claimed exemption applies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). It can carry this burden "by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that [it] has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate." *Brennan Ctr. for Justice v. U.S. Dep't of State*, 296 F. Supp. 3d 73, 80 (D.D.C. 2017).[1] If this information "is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents." *ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 626 (D.C. Cir. 2011).

---

[1] A *Vaughn* index describes each document or portion of a document the Government has withheld and the specific FOIA exemption that forms the Government's basis for the nondisclosure. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

**III.**

The Project does not challenge the reasonableness of the records search the Government conducted. *See generally* Pl.'s Cross-Mot. at 9-26. Fifteen Forest Service employees searched "the systems most likely to contain the responsive records," and used keywords like "Nestle" and "Arrowhead" that would "most likely locate the responsive information." Defs.' Mot., Attach. 4 at 2-3. These searches led to the identification of 465 emails, 869 photographs, six spreadsheets, five videos, and 3,218 PDF pages of responsive records. *Id*. at 3.

An employee from the Department of Agriculture's Office of General Counsel also searched for responsive records. *Id*. at 4. He found another 1,045 PDF pages. *Id*. at 3-4. Based on these results and the Government's detailed declarations, the Court finds that the search was reasonably calculated to uncover all relevant documents.

The Government produced 3,076 of the over 4,000 responsive pages it found. Pl.'s Mot. at 9. Some were "heavily redacted in part or in full." *Id*. The Project challenges the redactions and withholdings applied to roughly 280 of the responsive pages. *See* Pl.'s Cross-Mot. at 11; *Vaughn* Index, ECF No. 19-14. The Court addresses these challenges below.

**A.**

The Project argues that the Government improperly withheld information under FOIA Exemption 4. Pl.'s Cross-Mot. at 13. This exemption protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The Project contends that the Government redacted information about Nestlé's business operations that is already within the public domain. Thus, it argues, this information cannot be confidential. Pl.'s Cross-Mot. at 13. It also alleges that the Government has not

shown that releasing the information would substantially harm Nestlé's competitive position. *Id*. at 14. Both arguments fail.

### 1.

Information already available to the public "cannot cause competitive injury and is not protected from disclosure by Exemption 4." *PETA v. U.S. Dep't of Health & Human Services*, 901 F.3d 343, 352 (D.C. Cir. 2018); *see also Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999) ("[I]f identical information is truly public, then enforcement of an exemption cannot fulfill its purposes."). The party seeking the information "has the burden of showing that there is a permanent public record of the *exact portions* [it] wishes to obtain." *PETA*, 901 F.3d at 352 (emphasis in original).

The Project has not met this standard. It seeks unredacted versions of documents that contain "proprietary mapping information describing the location of springs, wells, and pathways to those locations[,] associated infrastructure information[,] technical specifications of equipment[,] geological and geophysical information concerning wells[,] and geological and hydrogeological analysis of springs." *Vaughn* Index at 1-2. It notes that "a report by Dames & Moore has been released to the public by the State of California Water Board." Pl.'s Cross-Mot. at 14. And it contends that this report contains "substantially equivalent—if not identical—information about Nestlé's operations." Pl.'s Cross-Mot. at 14.

To counter these claims, the Government submitted a declaration from Larry Lawrence, a Natural Resource Manager at Nestlé. *See* Lawrence Decl., ECF No. 25-1. He states that California released the Dames & Moore report in March 1999, and that many of the "infrastructure and location descriptions in this report are obsolete." *Id*. at 4. He adds that a large forest fire "completely destroyed" Nestlé's infrastructure in 2003. *Id*. at 4-5. Thus, "any

records created after the Old Fire of October 2003 contain information that is substantively and contextually different from that contained in the 1999 report." *Id*. at 5.

Mr. Lawrence's declaration also explains that company records created after 2003 reflect changed field conditions. *Id*. These conditions include "new materials for the infrastructure and monitoring systems, specific locations of certain infrastructure and controls within the right-of-way, and methods of affixing the infrastructure to the earth." *Id*. Finally, he notes that "the level of detail contained in the 1999 Report is conceptual and presents locations in large scale to establish relative locations." *Id*. By contrast, the company's confidential materials "are far more precise and present location information in a small scale format that is useful for the location of the infrastructure." *Id*.

The Project disagrees. It suggests that the Dames & Moore report "shows the exact location of [Nestlé's] bore holes, with precise descriptions, maps, photos, and detailed diagrams." Pl.'s Reply at 3. Thus, "[i]t simply could not be the case," the Project insists, "that the withheld information is more detailed as to bore hole locations, and it is certainly not the case that the Forest Service has met its burden of proof of showing that it is." *Id*.

But this argument misapplies the burden of proof. True, the Government generally bears the burden of showing that a FOIA exemption applies. *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977). But when a plaintiff contends that allegedly confidential business records are publicly available, *it* "has the burden of showing that there is a permanent public record of the exact portions" it seeks. *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1280 (D.C. Cir. 1992). The plaintiff bears this burden because, "were it otherwise, the government would face the daunting task of proving a negative: that requested information had

7

not been previously disclosed." *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013) (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)).

Moreover, the Project's assertion the withheld information cannot be more detailed than the Dames & More report is incorrect. The report features a "Site Plan" showing the rough locations of several springs and boreholes within the Strawberry Creek area. *See* ECF No. 22-3 at 12. It also includes pictures depicting the entrances to boreholes, rough sketches of collection facilities, and narrative descriptions of the boreholes and springs. *Id*. at 12-22. These diagrams support Mr. Lawrence's declaration that the report "presents locations on a large scale and establishes relative locations." Lawrence Decl. at 4. It is plausible that Nestlé has confidential diagrams of its operations featuring greater precision and accuracy than those created by Dames & Moore twenty years ago.

The Project also argues that publicly available documents created after 2003 "completely disclose the location and details of [Nestlé's] infrastructure," proving that Exemption 4 does not apply. Pl.'s Reply at 4-5. But the Project failed to provide or even raise the existence of these documents before its reply brief. It is a "well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015); *see also McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("Considering an argument advanced for the first time in a reply brief . . . is not only unfair to [the other party] but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered."). Fairness and prudence require

that the Court reject this argument.[2] Thus, the Project has failed to carry its "burden of showing that there is a permanent public record" of the information it seeks. *PETA*, 901 F.3d at 352.

## 2.

The Project contends that, even if the withheld information is not already public, it should not be treated as "confidential" for FOIA purposes. Pl.'s Cross-Mot. at 14. Whether information is confidential depends on whether it was disclosed on a voluntary or mandatory basis. *See Cornucopia Inst. v. Agricultural Mktg. Serv.*, 312 F. Supp. 3d 85, 93 (D.D.C. 2018). If disclosure was voluntary, the information is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 147 (D.C. Cir. 2001). But if mandatory, the information is confidential only if "disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id*. at 147-148.

The parties agree that Nestlé's disclosure to the Government was mandatory. *See* Defs.' Mot. at 9; Pl.'s Cross-Mot. at 16. And the Government has not argued that release of this information will impair its ability to obtain necessary records in the future. *See generally* Defs.' Mot. at 8-9. So the information is confidential and covered by Exemption 4 only if its release would substantially harm the company's competitive position.

---

[2] Even if the Court were to consider these new letters and reports, they do not conclusively establish that the withheld information the Project seeks is already public. For instance, some of these documents contain redactions about the locations of water collection systems. *See, e.g.*, ECF No. 29-1 at 29.

9

As Mr. Lawrence's declaration makes clear, it would. He explains that Nestlé has "numerous competitors, including large, nationally-recognized spring water bottling companies, as well as smaller regional or specialty water bottling companies." Lawrence Decl. at 6. These competitors "could use the Confidential Records to reverse-engineer [Nestlé's] internal business processes—a unique system that [Nestlé] uses to scientifically evaluate, license, and operationalize spring sites—in order to use these same internal processes to develop their own spring sources and spring water business." *Id*. He adds that competitors could also "use the equipment and infrastructure specifications that [Nestlé] has developed at great expense, for the design, construction, and/or installation of their own infrastructure and equipment." *Id*. at 7. For example, rivals could copy Nestlé's "sanitary and sustainable water collection system at a considerably lower cost." *Id*. Additionally, releasing the information could expose Nestlé to a free-rider problem, allowing rivals to profit from the firm's investment in "tailoring and perfecting" appropriate formats for equipment design, construction, and installation. *Id*. at 8.

The Project suggests that the Government's reliance on "self-serving statements by [Nestlé]" is improper. Pl.'s Reply at 6. But it cites no caselaw supporting the proposition that a FOIA defendant may not use declarations from third parties to support its determinations. In fact, if the Government sought to show a likelihood of competitive harm with no evidence from a Nestlé or industry subject matter expert, its arguments would probably fail. The Government's use of the Lawrence declaration was appropriate.

The Project also attacks the sufficiency of the Lawrence declaration. *Id*. at 7-8. It criticizes as "unsupported" the assertion that release of the information "could aid some hypothetical competitor in 'reverse-engineering' internal business processes." *Id*. at 7. And it

questions how "water infrastructure that has existed on public land for decades could possibly constitute an 'internal business process.'" *Id*.

This critique misses the mark. Mr. Lawrence's declaration does not suggest that Nestlé's physical infrastructure alone constitutes an internal business process. Rather, he states that the withheld information includes descriptions of a "system" the company uses to evaluate, develop, and operationalize the physical infrastructure. Lawrence Decl. at 6. Rival firms could use these illustrations of planned infrastructure projects, inventory information, and related data to improve their own evaluation and development procedures.

Next, the Project contends that "[n]o competitor has or could obtain water rights in Strawberry Creek, so any information gained by reviewing [Nestlé's] infrastructure specifications would be useless, as the systems and methodologies only apply to Strawberry Creek." Pl.'s Reply at 7; *see also* Pl.'s Cross-Mot. at 17. Again, this argument misunderstands the possible competitive harm. As the Government suggests, "although no other entity may have, at this time, applied for a special use permit [for Strawberry Creek], they have the right to do so." Defs.' Reply at 7, ECF No. 25. More broadly, the Project offers no support for its contention that Nestlé's infrastructure, systems, and methodologies apply only to Strawberry Creek. It is not unreasonable to believe that other companies could apply this information to locations with similar characteristics.

Finally, the Project seeks "an opportunity to conduct discovery of [Nestlé] regarding its claimed competitive injury." The Court rejects this request. True, the Government has not established that Nestlé *will* be harmed if it releases the information the Project seeks. But no such showing is required. Though "[c]onclusory and generalized allegations of substantial harm . . . are unacceptable and cannot support an agency's decision to withhold requested documents,"

11

the Government "need not show actual competitive harm." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983) (cleaned up). Indeed, because "predictive judgments are not capable of exact proof," courts generally defer to the Government's determinations about the "repercussions of disclosure." *United Tech. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 563 (D.C. Cir. 2010) (cleaned up).

In short, the Project failed to show that the information it seeks is already publicly available. And release of this information would likely cause substantial harm to Nestlé's competitive position. Thus, the Court finds that the non-disclosed withheld information is "confidential' within the meaning of Exemption 4. *Accord Story of Stuff Project*, 2018 WL 4637357 at *7.

### B.

The Project also challenges the Government's withholding of records under FOIA Exemption 5. Pl.'s Cross-Mot. at 17-20. This exemption protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Under Exemption 5, an agency can withhold information covered by a recognized evidentiary or discovery privilege. *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 847 F.3d 735, 738-39 (D.C. Cir. 2017).

Here, the Government invoked two of these privileges—deliberative process and attorney-client. *See Vaughn* Index at 5-7. The deliberative process privilege is "unique to the government" and protects "predecisional" deliberative documents from disclosure. *Coastal States Gas Corp. v. U.S. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). It allows agencies to "withhold documents and other materials that would reveal advisory opinions, recommendations, and deliberations comprising part of a process by which governmental

decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (cleaned up).

The Government asserts that the "withheld information reflects the internal comments and discussions between members of the [Forest Service's] interdisciplinary team assigned to analyze" the Nestlé permit renewal decision. Rush Decl. at 7, ECF No. 19-4. This information was "pre-decisional because the [Forest Service] had not issued a decision on the project at the time the responsive records were provided." *Id*. And it was deliberative because it included "ongoing policy discussions prior to final decision by the agency," and because the Forest Service "anticipated litigation on the project once the decision was issued." *Id*.

The Project contests these assertions as applied to records including an "analysis of existing conditions in the subject watershed and groundwater flow." Pl.'s Cross-Mot. at 19. It argues that descriptions of existing conditions at the Strawberry Creek Watershed are "not deliberative in nature but rather a recitation of facts subject to release under FOIA." *Id*. It suggests, for instance, that redacted information under the heading "Existing Condition" or the sub-heading "General hydrology," cannot be deliberative because of its "obvious factual nature." Pl.'s Reply at 9. The Project also contests the "predecisional" nature of the withheld information. It suggests that "much of the information could apply to Nestlé's previous permit, making it post-decision rather than pre-decisional." Pl.'s Cross-Mot. at 19.

The Court cannot agree. First, the Project's "blanket assertion that some of the withheld information may include discussions about prior permits awarded to [Nestlé], and therefore is not 'predecisional,' lacks substantiation." *Story of Stuff Project*, 2018 WL 4637357 at *8. The Forest Service's FOIA Coordinator declared that "[a]ll of the information withheld under

Exemption 5 relates to the ongoing permit review process." Second Rush Decl. at 4, ECF No. 25-2. The Project's conclusory contention does not overcome this declaration.

Second, factual content can be "inextricably intertwined with the deliberative sections of documents" so that "its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). That a document may have a section titled "Existing Condition" does not prove that the information within that section is not deliberative. And the Project offers nothing beyond speculation to overcome the Government's declaration that the withheld sections include "content in which members of the interdisciplinary team solicit ideas from one another about how to proceed." Second Rush Decl. at 4. The Government properly invoked the deliberative process privilege.

The Project also objects to the Government's use of the attorney-client privilege. This privilege "protects confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 200 (D.D.C. 2011) (cleaned up). In the FOIA context, "the agency is the 'client' and the agency's lawyers are the 'attorneys' for the purposes of attorney-client privilege." *Id*.

The Government explains that it withheld "attorney-client communications between the San Bernardino National Forest [staff] and OGC." *Id*. at 8. These communications featured discussions of "legal issues, factual background, and other matters that are the subject of active litigation in the Ninth Circuit Court of Appeals." *Id*. (citing *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 16-56717 (9th Cir. 2016)). Some withheld pages also include "confidential, solicited advice from USDA Office of General Counsel attorneys about legal issues related to the [Nestlé] permitting process." Second Rush Decl. at 5.

14

The Project notes that "[t]hroughout its document production where [the Government] invoke[s] attorney-client privilege, [it] redact[s] full or near-full pages as privileged." Pl.'s Cross-Mot. at 20. It suggests that some documents "might generally have withholdable portions," and that they "likely contain segregable portions as well." Pl.'s Reply at 10. But again, the Project offers only unsubstantiated assertions. Without more, the Court finds no reason to doubt the FOIA Coordinator's assertion that the Forest Service "carefully reviewed each responsive record on a page-by-page and line-by-line basis in an attempt to identify reasonably segregable, non-exempt information." Second Rush Decl. at 3. "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability" of other information. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Thus, the Court finds that the Government properly invoked the attorney-client privilege to withhold information under Exemption 5.

### C.

Next, the Project contests the Government's withholding of information under Exemption 6. This exemption protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Government relied on Exemption 6 to withhold the names of "Nestlé's environmental and engineering consultants and other scientists who communicated with the Forest Service to transmit studies and prepared reports on behalf of the company." Pl.'s Cross-Mot. at 22. The Court finds this exemption inapplicable.

The first step of the inquiry requires the Court to confirm that the information sought constitutes personnel, medical, or similar files under Exemption 6. *Multi Ag Media LLC v. U.S. Dep't of Agriculture*, 515 F.3d 1224, 1228 (D.C. Cir. 2008). The Project does not argue that the

names it seeks are not covered by the term "similar files," which it concedes is "to be interpreted broadly." Pl.'s Cross-Mot. at 21. *See also Story of Stuff Project*, 2018 WL 4637357 at *10.

The second step of the inquiry asks the Court to determine whether "disclosure of the [names] would compromise a substantial, as opposed to *de minimis*, privacy interest." *Multi Ag Medial LLC*, 515 F.3d at 1229. If "no significant privacy interest" is implicated, "FOIA demands disclosure." *Id*. But if the interest is greater than a *de minimis* interest, disclosure is required if the public need for the information outweighs the individual privacy concerns. *Id*. at 1230. The Government bears the burden of showing that a substantial invasion of privacy will occur if it releases the names. *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015).

It has not met this burden. The Government argues that it withheld the names because "[t]here is no identifiable reason that the public interest would be advanced by [the Forest Service] revealing" them. Defs.' Mot. 13. It suggests that the individuals "have access to, and are extremely knowledgeable about, [Nestlé's] very valuable information," and that disclosure of their names could "expose them to unwanted contact in order to obtain this valuable data from them." *Id*. at 13-14. Revealing their names "will potentially subject them to harassment based upon their association" with Nestlé. *Id*. at 14.

The Project contends that it needs the names to "judge the qualifications of those who prepared the reports . . . since Nestlé has provided them to public agencies in support of its argument that it has a right to use public resources." Pl.'s Reply at 12; *see also* Pl.'s Cross-Mot. at 22. It adds that Exemption 6 "cannot protect the identity of those in business relationships with the government," and that these individuals' work "forms the bases for the decisions made by the Forest Service to allow [Nestlé] to continue to extract water from" the Strawberry Creek

16

Watershed. *Id*. at 10.

The Court agrees. The "disclosure of names and addresses is not inherently and always a significant threat to the privacy of those listed; whether it is a significant or a *de minimis* threat depends upon the characteristic(s) revealed." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 877 (D.C. Cir. 1989). Nestlé's CEO and executive leadership team likely have access to the "very valuable information" that the firm's consultants, engineers, and lawyers possess. Their names and photographs are publicly available. *See* https://www.nestle-watersna.com/en/who-we-are/our-leadership. Additionally, while information about "marital status, legitimacy of children . . . alcoholic consumption, family fights, reputation, and so on falls within the ambit of Exemption 6," information "connected with professional relationships" does not. *Sims v. CIA*, 642 F.2d 562, 574 (D.C. Cir. 1980). Thus, while not *de minimis*, the Court finds that the privacy interests involved are not substantial.

More, the public's interest in disclosure outweighs these privacy interests. Nestlé employees and consultants prepared reports to aid the Forest Service in making its permit renewal decision about publicly owned forest lands. Defs.' Reply at 14. The public has a plausible interest in evaluating these individuals' qualifications. The Court thus finds that Exemption 6 does not apply to their names.[3]

---

[3] The Court's finding does not extend to the email addresses and personal telephone numbers of the individuals, which the Project does not seek and the Government need not disclose.

17

**D.**

Lastly, the Project challenges the Government's withholding of information under Exemption 9.[4] This exemption protects "geological and geophysical information and data, including maps, concerning wells." 5 U.S.C. §552(b)(9). The Project argues that the word "wells" must be construed strictly, and that it seeks "information related to 'bore holes' and not 'wells.'" Pl.'s Cross-Mot. at 24. The Government contends that the Project "incorrectly assumes that boreholes and wells are two separate entities." Defs.' Reply at 16. The Government is correct.

Though perhaps a bit dry, some definitions are in order. A "well" is a "hole or shaft sunk into the earth to obtain a fluid, such as water, oil, or natural gas." *Well*, Black's Law Dictionary (10th ed. 2014). A "borehole" is "a hole bored or drilled in the earth, such as an exploratory well" or a "small-diameter well drilled especially to obtain water." *Borehole*, Merriam-Webster's Collegiate Dictionary (10th ed. 1996). "Borehole" has also been defined as a "deep, narrow hole made in the ground, especially to locate water or oil." *Borehole*, Oxford English Dictionary Online, https://en.oxforddictionaries.com/definition/borehole. These definitions make it clear that a borehole is a type of well. Both terms refer to a hole created in the earth to obtain a fluid. And because Exemption 9 unambiguously covers "wells," the Government appropriately withheld the borehole maps and related information.

The Project's arguments to the contrary are unpersuasive. First, it cites U.S. Food & Drug Administration ("FDA") regulations defining "spring water." These regulations note that

---

[4] For many of the contested pages, the Government invoked both Exemptions 4 and 9. Because the Court has found that Exemption 4 was properly applied, its prior analysis covers these pages. But the Government relied only on Exemption 9 for at least seven pages of records, necessitating a decision on the parties' arguments. *See Vaughn* Index at 7.

"[s]pring water shall be collected only at the spring or through a bore hole tapping the underground formation feeding the spring. There shall be a natural force causing the water to flow to the surface through a natural orifice." 21 C.F.R. § 165.110(a)(2)(vi). Contrasting "spring water" with "artesian water," the FDA explained that the former comes from "an underground source where water flows naturally to the earth's surface," while the latter "comes from a well tapping a confined aquifer." 60 Fed. Reg. 57,076, 57,092 (Nov. 15, 1995). The Project suggests that because the regulations "refer to wells and bore holes as two separate things," and because Nestlé "refer[s] to [its] water sources as bore holes and never as wells," boreholes and wells must be distinct. Pl.'s Reply at 14.

But the FDA's regulations do not apply to the Freedom of Information Act. *See* 5 U.S.C. § 552. And even if they did, they do not establish that a borehole is not a well for the purposes of Exemption 9. Instead, they differentiate between two types of water based on how each is collected. And they fit with the definitions cited above—a borehole is a "drilled" or "made" well, rather than a naturally occurring well.

Second, the Project cites *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101 (D.C. Cir. 2017) in support of its position. But *AquAlliance* did not hold that Exemption 9 should be construed so narrowly as to exclude boreholes. There, the plaintiff argued that the exemption applies only to oil and gas wells and not water wells. The D.C. Circuit rejected this argument, finding that the text of the exemption says "geological and geophysical information 'concerning wells,' without any such adjectival limitation." *AquAlliance*, 856 F.3d at 105. Thus, the Court will grant the Government summary judgment as to Exemption 9.[5]

---

[5] The Project's request for *in camera* review of the redactions, raised for the first time in its reply brief, will be denied. The Government has sufficiently shown the applicability of the exemptions it claims. Nor is there any evidence of agency bad faith. Thus, summary judgment is appropriate without *in camera* review of the documents. *ACLU v. U.S. Dep't of Defense*, 628 F.3d 612, 626 (D.C. Cir. 2011).

19

## IV.

For these reasons, the Government's Motion for Summary Judgment and the Project's Cross-Motion for Summary judgment will be granted in part and denied in part. A separate order will issue.

Dated: February 4, 2019                                     _____
                                                            TREVOR N. McFADDEN, U.S.D.J.